# United States District Court
# District of Massachusetts

CHARLES JAYNES,
       Petitioner,

    V.                           C.A. NO. 03-11582-WGY

LISA MITCHELL,
       Respondent.

## REPORT AND RECOMMENDATION ON PETITION UNDER 28 U.S.C. § 2254 FOR A WRIT OF HABEAS CORPUS (#34)

COLLINGS, U.S.M.J.

### I. INTRODUCTION

Charles Jaynes ("Jaynes" or "petitioner"), through counsel, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. A Massachusetts jury convicted Jaynes on December 11, 1998 of the second-degree murder and kidnapping of ten-year-old Jeffrey Curley.

Jaynes originally filed his petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus on August 18, 2003. He filed an amended petition on December

5, 2003, adding certain unexhausted claims, and simultaneously moved to stay habeas proceedings in order to exhaust those claims in state court. On December 29, 2003, the district court (Lasker, J.) granted the motion to stay. After pursuing relief in the Massachusetts state court, on September 26, 2010, Jaynes filed a motion to amend his habeas petition (#29), which the district court allowed on October 19, 2010. (#31-32) Jaynes filed his Amended Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. (#34) The respondent ("respondent" or "the Commonwealth"), filed its answer to amended petition (#37) on April 15, 2011, and a supplemental answer on April 18, 2011. (#39) On September 16, 2011, Jaynes filed an assented-to motion to delete certain claims as unexhausted (#43), which the Court granted on the same day. Thereafter, on October 3, 2011, Jaynes filed his memorandum of law in support of habeas petition (#45), with accompanying exhibits. (#45-1, Aff. of Jayne Lawton; #45-2, Letters from Attorney Pumphrey) On March 16, 2012, the respondent filed its memorandum of law in opposition to petition for writ of habeas corpus. (#49) On May 14, 2012, Jaynes filed his reply memorandum. (#52) On September 3, 2013, at the Court's request, the respondent filed its further supplemental answer (#53), which included the complete trial transcripts. The motion is poised for disposition.

## II. BACKGROUND

### A. Factual Setting

The facts surrounding Jeffrey Curley's murder and kidnaping, for which Jaynes was convicted, have been set forth in the Massachusetts Appeals Court ("MAC") decision affirming Jaynes's conviction. *Commonwealth v. Jaynes,* 55 Mass. App. Ct. 301, 302-06, 770 N.E.2d 483 (Mass. App. Ct. 2002). The following discussion presumes familiarity with those facts. Otherwise, the Court sets out the pertinent facts where necessary in the discussion section that follows.

### B. State Procedural Background

Jaynes was convicted of second degree murder and kidnaping on December 11, 1998. On July 18, 2000, Jaynes filed a motion for a new trial in state court raising claims that 1) the trial judge gave an improper instruction on involuntary manslaughter; 2) the trial judge failed to instruct the jury that the Commonwealth was required to proved beyond a reasonable doubt that the murder occurred in Massachusetts; 3) the trial judge's closure of the courtroom on several occasions violated Jayne's right to a public trial. (#39, S.A. 88-113) The trial court denied the motion for a new trial on September 14, 2000,

declining to reach the merits of the claims because trial counsel had failed to lodge objections on these grounds. (#39, S.A. 135-136) Jaynes's direct appeal was consolidated with the appeal from the denial of the motion for a new trial. (#39, S.A. 27) On appeal to the MAC, Jaynes presented the three issues raised in the motion for new trial. (#39, S.A. 25-26) The Massachusetts Appeals Court ("MAC") affirmed the conviction, *see Jaynes*, 55 Mass. App. Ct. at 302, and the Supreme Judicial Court ("SJC") denied further appellate review on September 6, 2006. *Commonwealth v. Jaynes*, 437 Mass. 1108, 774 N.E.2d 1098 (Mass. 2002).

After filing his habeas petition in this court, and obtaining a stay of the petition, on April 18, 2008, Jaynes filed a second motion for a new trial, raising several additional claims[1]: 1) the trial court violated Jaynes's due process rights by allowing the admission of evidence about Jaynes's sexual interest in boys; 2) the trial court's admission of testimony that Jaynes declined to talk with the police abridged Jaynes's Fifth Amendment right against compelled testimony; 3) the trial judge abused her discretion in declining to admit certain of Jaynes's co-defendant's statements; 4) certain evidence seized from Jaynes's car should

---

[1]
     Certain of these claims were not presented on appeal, and Jaynes has deleted them from his habeas petition. The Court does not discuss them further.

have been suppressed; and 5) trial counsel was ineffective in several respects, including for failing, among other things, to move to suppress illegally seized evidence, and for failing to object at trial on the grounds raised in the first motion for a new trial; 6) appellate counsel was ineffective in failing to raise on appeal the issues presented in argument 5; 7) the combined errors committed in the case caused a substantial risk of a miscarriage of justice. (#39, S.A. 486-487) The MAC affirmed the order denying the second motion for a new trial. *See Commonwealth v. Jaynes*, 2010 WL 2813572, 77 Mass. App. Ct. 1110, 929 N.E.2d 1001 (Mass. App. Ct. 2010) (unpublished). The SJC denied further appellate review on September 29, 2010. *See Commonwealth v. Jaynes*, 458 Mass. 1105, 936 N.E.2d 325 (Mass. 2010) (Table). The petitioner filed a motion for rehearing on August 2, 2010. (#42-1) The petition for rehearing was denied on August 19, 2010. (#42-2)

### III. *ANALYSIS*

### A. Overview of Claims

After having voluntarily deleted certain unexhausted claims, Jaynes asserts the following claims in his amended petition: 1) the trial court improperly instructed the jury on involuntary manslaughter, effectively shifting

the burden of proof to the defendant in violation of petitioner's due process rights; 2) the trial court erred in failing to instruct the jury on jurisdiction, thereby abridging the petitioner's right to a jury determination on each element of the offense; 3) the trial court violated Jaynes's right to a public trial by closing the courtroom during jury selection; 4) trial counsel's multiple errors created a cumulative effect resulting in ineffective assistance;[2] 5) the trial court abridged petitioner's rights to due process and a fair trial by permitting the introduction of inflammatory evidence; 6) the trial court abridged Jaynes's Fifth Amendment privilege against self-incrimination by allowing the admission of testimony that Jaynes had declined to speak with police; 7) the trial court's decision to exclude certain of Jaynes's co-defendant's statements violated Jaynes's rights to due process, to present a defense and to confront witnesses against him; and 8) appellate counsel was constitutionally deficient in several respects. (#45)

The Court considers these claims below.

## B. Standard of Review

---

[2] Jaynes specifically cites to counsel's failure to file a motion to suppress evidence obtained from searches of Jayne's car and apartment; failure to object to the burden-shifting manslaughter instruction; failure to request an instruction on jurisdiction; failure to object to the court room closing; failure to hire an investigator; failure to consult with experts; failure to properly review the evidence and prepare for trial; failure to effectively cross examine witnesses, and failure to move for a mistrial.

"[A] federal court may not issue a habeas petition 'with respect to any claim that was adjudicated on the merits in State court proceedings' unless the state court decision: 1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *McCambridge v. Hall,* 303 F.3d 24, 34 (1st Cir. 2002) (quoting 28 U.S.C. § 2254(d) (Supp. II 1996)). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413, 120 S.Ct. 1495, 1523 (2000). A decision represents an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. An "unreasonable application" requires "some increment of incorrectness beyond error. . . . The increment need not necessarily be great, but it must be great enough to make the decision

unreasonable in the independent and objective judgment of the federal court."

*McCambridge*, 303 F.3d at 36 (internal quotations and citation omitted).  The

Supreme Court has explained that

> [t]his distinction creates a substantially higher
> threshold for obtaining relief than *de novo* review.
> AEDPA thus imposes a highly deferential standard
> for evaluating state-court rulings, and demands
> that state-court decisions be given the benefit of
> the doubt.

*Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (internal

quotation marks and citations omitted) (footnote omitted).  Furthermore,

> [w]hen assessing whether a state court's
> application of federal law is unreasonable, 'the
> range of reasonable judgment can depend in part
> on the nature of the relevant rule' that the state
> court must apply.  Because AEDPA authorizes
> federal courts to grant relief only when state
> courts act *unreasonably*, it follows that '[t]he
> more general the rule' at issue—and thus the
> greater the potential for reasoned disagreement
> among fair-minded judges—'the more leeway
> [state] courts have in reaching outcomes in
> case-by-case determinations.'

*Id.* at 776 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140

(2004) (second and third alterations in original).  *See also*, *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123, 129 S.Ct.1411, 1420 (2009) (where the federal

standard is general, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard").

## C. Analysis of Claims

### GROUND 1:

#### Improper Instruction of Involuntary Manslaughter

Jaynes contends that the trial court's instruction on involuntary manslaughter improperly shifted the burden of proof in contravention of the constitutional requirement that the prosecution bears the burden of establishing guilt beyond a reasonable doubt of each of the elements of a crime. At the charge conference, the defense counsel requested an involuntary manslaughter instruction based on the testimony of the medical examiner. (Tr. 2193-94) The defense theory was that the medical examiner could not say whether the placing of a rag over the victim's mouth was intended to render him unconscious or to cause death. (Tr. 2193-94) After the Commonwealth removed its objection to the instruction, the trial judge agreed to include an instruction on involuntary manslaughter. (Tr. 2216) The trial court provided the jury with a lengthy instruction on involuntary manslaughter to which the petitioner objects. In introducing the concept, the court said

. . . in order to prove a defendant guilty of involuntary manslaughter, the Commonwealth must prove beyond a reasonable doubt either an [sic] killing unintentionally caused either in the commission of a battery when the defendant knew or should have known that the battery he was committing endangered human life, or the Commonwealth must prove beyond a reasonable doubt an unlawful killing unintentionally caused by an act of the defendant that constitutes such a disregard of probable harmful consequences to another as to rise to the level of wanton or reckless conduct.

(Tr. 2370)

The respondent argues that Jaynes has procedurally defaulted the claim by failing to object at trial to the instruction. This Court agrees that the claim is procedurally defaulted. *See, e.g.*, *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010) ("Federal habeas review of a particular claim is precluded in circumstances in which a state prisoner has defaulted on that claim in state court by virtue of an independent and adequate state procedural rule.") (citing *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546 (1991)). The First Circuit has consistently held "that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed

in its court." *Janosky*, 594 F.3d at 44. Although the MAC conducted a merits analysis of Jaynes's claims under the miscarriage of justice standard, "[t]his discretionary miscarriage-of-justice review does not amount to a waiver of the state's contemporaneous objection rule." *Id.* Given the procedural default, this court cannot address the claim "unless the habeas petitioner can demonstrate cause for the default and actual prejudice." *Id.*

Jaynes, anticipating this defense, contends that he has adequately established cause for the default because his trial counsel was constitutionally ineffective in failing to lodge an objection to the instruction at trial. (#45 at 21) It is true that "ineffective assistance of counsel, so severe that it violates the Sixth Amendment, may constitute sufficient cause to excuse a procedural default as long as the petitioner exhausted his ineffective assistance claim in state court." *Janosky*, 594 F.3d at 44 (citing *Murray v. Carrier*, 477 U.S. 478, 488-89, 106 S.Ct. 2639 (1986) (superseded by statute on other grounds, AEDPA, Pub. L. 104-132, 110 Stat. 1214). Here, Jaynes raised the ineffectiveness of trial counsel claim for the first time in his second motion for a new trial, and the MAC rejected the ineffective assistance of counsel claim as follows: "[t]he [involuntary instruction claim has] already been rejected by this court and

fare[s] no better 'newly attired in the garb of ineffective assistance of counsel.'" *Jaynes*, 2010 WL 2813572 at*4 (quoting *Commonwealth v. Sowell*, 34 Mass. App. Ct. 229, 236, 609 N.E.2d 492, 496 (Mass. App. Ct. 1993)). In short, the MAC rejected this ineffective assistance of counsel claim because the claim at the heart of it- the purported improper instruction–lacked merit; it would thus have been futile for counsel to pursue it.

In his habeas petition, Jaynes argues that the MAC's resolution of the ineffectiveness claim should be reviewed *de novo*, and his argument focuses primarily on the prejudice prong of the familiar *Strickland* standard. *See Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067 (1984) ("any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."). The Court will bypass the question of standard of review because even under *de novo* review Jaynes has failed to demonstrate ineffective assistance of counsel as cause for his procedural default. *Cf.*, *Janosky*, 594 F.3d at 44 (bypassing standard of review question when an ineffectiveness claim is "nested within the cause-and-prejudice standard").

To succeed on a Sixth Amendment claim of ineffective assistance of

counsel, a defendant must establish that his "counsel's representation 'fell below an objective standard of reasonableness'" and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Moreno-Espada v. United States*, 666 F.3d 60, 64 (1st Cir., 2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366, 130 S. Ct. 1473, 1482)(2010) (further internal quotation marks and citation omitted). Under *Strickland*, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. With regard to the performance aspect of the standard, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' and [a petitioner] 'must overcome the presumption that . . . the challenged action might be considered sound trial strategy.'" *Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010) (quoting *Strickland*, 466 U.S. at 689) (further citation and internal quotation marks omitted) (third alteration in original). Accordingly, "a lawyer's performance is deficient under *Strickland* 'only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it.'" *Id.*

(quoting *Knight v. Spencer*, 447 F.3d 6, 15 (1ˢᵗ Cir. 2006)).[3]

Although Jaynes grounds his argument in the performance prong of *Strickland*, the Court notes that Jaynes has made scant effort to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Moreno-Espada,* 666 F.3d at 64 (internal quotation marks and citation omitted). And in the context of "cause and prejudice," Jaynes must show "'not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Costa v. Hall*, 673 F.3d 16, 26 (1ˢᵗ Cir. 2012) (quoting *Murray,* 477 U.S. at 494) (alterations original).

The record shows that trial counsel's sole basis for seeking the instruction was based on the medical examiner's testimony that he (the medical examiner)

---

3

As I wrote in the case of *McCray v. Mitchell,* 2014 WL 5464104 * 2 (footnote 2) (D. Mass., October 28, 2014), "[i]n the *Knight* opinion, no attribution is given for the quotation. However, research has revealed that it comes from the Fifth Circuit's *en banc* decision in *Strickland,* i.e., *Washington v. Strickland,* 693 F.2d 1243, 1254 (5ᵗʰ Cir. 1982). The Fifth Circuit's decision was reversed by the Supreme Court in *Strickland,* 466 U.S. 668, an opinion which was issued over twenty years before the First Circuit's decision in *Knight.* However, despite the quotation coming from a decision was which was reversed, the quotation is not in conflict with the Supreme Court's holding in *Strickland,* and the First Circuit has, as recently as December, 2013, cited the principle as current law. *Pena v. Duckhaut,* 736 F.3d 600, 605 (1ˢᵗ Cir. 2013); *see also United States v. Valerio,* 676 F.3d 237, 246 (1ˢᵗ Cir. 2012); *United States v. Rodriguez,* 675 F.3d 48, 56 (1ˢᵗ Cir. 2012); *West v. United States,* 631 F.3d 563, 567 (1ˢᵗ Cir.), *cert. denied,* 132 S.Ct. 268 (2011); *Tevlin v. Spencer,* 621 F.3d 59, 66 (1ˢᵗ Cir. 2010); *Abrante v. St. Amand,* 595 F.3d 11, 19 (1ˢᵗ Cir.), *cert. denied,* 131 S.Ct. 168 (2010)." Thus, I shall apply the standard set forth in the *Knight* case in the instant case.

could not conclude that the gasoline-soaked rag was used on Jeffrey Curley with the intent to render Curley unconscious or with the intent to kill him. (Tr. 2193-95, 2203-10, 2213-16)  The trial judge gave the instruction on that basis. *Id.* Trial counsel did not press this theory in his closing argument; indeed, the record shows that trial counsel had not contemplated an involuntary manslaughter theory at the start of the trial, but requested the instruction on the theory that the jury would draw the inference that Jaynes did not intend to kill Curley, but merely intended to render him unconscious.  *Id.* The theory the defense argued in closing, however, was that Jaynes was guilty of, at most, accessory after the fact of murder.  (Tr. 2255) In short, while Jaynes's petition has hinted at the "*possibility* of prejudice," *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596 (1982), even if the Court assumes the deficiency of counsel's performance, and error in the instruction, Jaynes has offered no persuasive argument that these purported "errors worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.*  As in *Frady*, Jaynes "has never presented colorable evidence . . . that would reduce his crime from murder to manslaughter," *id.* at 171, and he has not done so now.  Indeed, Jaynes's argument is this: "[b]y depriving

Jaynes of the opportunity to have the jury convict him of a much less serious offense, this error prejudiced him." (#45 at 23) This contention falls far short of establishing actual prejudice. Rather, the Court is persuaded by the MAC's assessment that:

> the defendant's argument is based on a stray, innocuous sentence surrounded by eighty-six pages of uncontested instructions. Furthermore, the jury submitted no question indicating that they were struggling with the elements of involuntary manslaughter in the course of their deliberations. Finally, the evidence presented at trial was more than adequate to warrant a conviction of murder in the second degree.

*Jaynes*, 55 Mass. App. Ct. at 308 n.8, 770 N.E.2d at 489 n.8.

Because Jaynes has failed to overcome the formidable "prejudice" prong to overcome his procedural default, the Court may not consider the claim on habeas review.

## GROUND 2:

## Failure to Instruct on Jurisdictional Question

Jaynes next contends that habeas relief is warranted on federal due process grounds because territorial jurisdiction is an element of the crime, and the trial court "fail[ed] to instruct the jury that, in order to obtain a murder

conviction, the Commonwealth had to prove beyond a reasonable doubt that the violence or injury from which Jeffrey's death ensued occurred in Massachusetts." (#45 at 23) The respondent argues that the claim is unexhausted because Jaynes never presented the constitutional claim he raises now within the four corners of his ALOFAR, and that even if the claim were deemed exhausted, it lacks merit.

The Court agrees that Jaynes failed to present his constitutional claim to the Supreme Judicial Court "in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." *Clements v. Maloney*, 485 F.3d 158, 162 (1st Cir. 2007) (internal quotation marks and citation omitted), *cert. denied* 130 S.Ct. 3475 (2010). Here, the petitioner raised a Sixth Amendment right-to-jury claim in front of the MAC, invoking both the federal due process clause and the Sixth Amendment right to a jury trial and proof beyond a reasonable doubt of all elements of the offense. (*See* #39, S.A. 26, 46, 51) The MAC resolved the claim by determining that no jurisdictional instruction was required, because "there was conclusive evidence of the kidnapping of the child in [Massachusetts], and all of the circumstantial evidence pointed to Massachusetts as the site of the murder."

*Jaynes*, 55 Mass. App. Ct. at 309, 770 N.E.2d at 489. The MAC further concluded that, under the pertinent state statute, "the Commonwealth has jurisdiction to prosecute a defendant for murder, even in cases in which the victim's death occurs outside the Commonwealth, when the violence or injury leading to the victim's death is begun in the Commonwealth." *Id.* at 309, 770 N.E.2d at 489. Given the details presented at trial, the MAC rejected the claim because it was "not reasonable nor possible to assume that the victim was not forcibly confined or murdered in Massachusetts." *Id.* at 310, 770 N.E.2d at 490.

When Jaynes applied for further appellate review, he framed this claim only in terms of state law. Specifically, his ALOFAR argued that "absent force or injury, a kidnapping within the Commonwealth does not give the Commonwealth jurisdiction over a killing outside the Commonwealth." (#39, S.A. 434) He faulted the MAC for reading Massachusetts' case law "as holding that a kidnapping in the Commonwealth *per se* confers jurisdiction over murder committed in other states, even without a jury finding of either violence or injury within the Commonwealth." (#39, S.A. 434) (emphasis original) Both of the Massachusetts cases to which Jaynes cites in his ALOFAR involve the

SJC's interpretation of the state's jurisdictional statute. The ALOFAR "did not identify the claim as federal in nature, did not rely on any federal case law, and did not argue the point in federal constitutional terms. By the same token, the state-law precedents cited in that portion of the ALOFAR did not themselves rely on federal law." *Janosky*, 594 F.3d at 50. Under these circumstances, the Court must conclude that Jaynes failed to present his right-to-jury trial claim "fairly and recognizably to the SJC." *Id.*

Jaynes contends that his statement in the ALOFAR that "the failure to instruct the jury that proof of jurisdiction was necessary for conviction requires reversal" was sufficient to put the SJC on notice of the federal claim. (#52 at 2) Although the First Circuit has observed that "using vague (and possibly federal law based) phrases such as 'due process,'" *Clements*, 485 F.3d at 163, may render an application ambiguous as to the nature of the claims presented (thus requiring resort to the MAC briefs as "backdrop" materials to answer the exhaustion question), here the ALOFAR is not ambiguous as the nature of the claims, which were argued solely in terms of state law.[4]

---

[4] The Court must disagree with the petitioner's assertion that First Circuit law holds that "[u]nless a claim has been 'abandoned' before the SJC, the exhaustion analysis includes examination of 'backdrop materials' filed in the trial court and the MAC." (#52 at 2) In *Clements* itself, the First Circuit concluded that one of the petitioner's claims–which *had been* presented to the SJC albeit "solely in terms of state law" was unexhausted, and that the "backdrop" rule did not apply because the claim was "unmistakably couched only

Although this conclusion renders this petition a "mixed" one subject to dismissal, the Court shall not dismiss the petition but rather go forward with all claims pursuant to 28 U.S.C. § 2254(b)(2).

<u>GROUND 3:</u>

<u>Closure of the Courtroom during *Voir Dire*</u>

In Ground Three of his petition, Jaynes complains that the trial court "repeatedly closed the courtroom during jury selection, at the request of jurors who expressed privacy concerns." (#34 at 9) He alleges a violation of his right to a public trial because he "did not personally make a knowing, intelligent, and voluntary waiver of his right to a public trial." *Id.* He invokes the clearly established law set out in *Waller v. Georgia*, 467 U.S. 39, 46 (1984), and in *Press-Enterprise Co. v. Superior Court of California, Riverside*, 464 U.S. 501, 508 (1984). The petitioner concedes that the MAC decided the constitutional claim on the merits and that review is under AEDPA's deferential standard.

"The Supreme Court made clear in *Waller v. Georgia*, 467 U.S. 39, 46 (1984), that the Sixth Amendment guarantees criminal defendants the right to a trial that is open to members of the public." *Bucci v. United States*, 662 F.3d

_____

in state law terms." *Id.* at 164-65.

18, 21-22 (1st Cir. 2011), *cert. denied*, 133 S. Ct. 277 (2012). And the Sixth

Amendment right to an open trial extends to juror *voir dire*. *Presley v. Georgia*,

558 U.S. 209, 213 (2010) (*per curiam*). The First Circuit has further clarified

the contours of the right:

> This right was 'created for the benefit of the defendant,' as openness in criminal proceedings 'encourages witnesses to come forward,' 'discourages perjury,' and 'ensure[s] that judge and prosecutor carry out their duties responsibly.' Closure of a trial can be justified only by an overriding interest, 'such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information.' 'Such circumstances will be rare, however, and the balance of interests must be struck with special care.'

*Bucci*, 662 F.3d at 22 (quoting *Waller*, 467 U.S. at 45-46) (alterations original).

The Supreme Court in *Waller* enunciated a four-part test for trial courts to apply

before they can exclude the public from any stage of a criminal trial:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

The Supreme Court has made clear that "the right to a public trial in criminal cases extends to the jury selection phase of trial, and in particular the *voir dire* of prospective jurors." *Presley*, 558 U.S. at 213.[5] "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *In re Oliver*, 333 U.S. 257, 270 n.25 (1948) (internal citation omitted). The presumption toward openness, however, "may give way in certain cases to other rights and interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. But the presumption "'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id.* (quoting *Press-Enterprise*, 464 U.S. at 510). Under *Waller*, the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than

---

[5] *Presley* had not been decided at the time that the MAC rendered its decision, so the Court need not consider the specifics of *Presley* in assessing the reasonableness of the MAC's decision under AEDPA's standard.

necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure. *Waller*, 467 U.S. at 48.

The MAC resolved Jaynes's claim as follows:

> There is no question that the right to a public trial extends to both the defendant and the public, and covers 'the voir dire examination of potential jurors concerning their qualifications to serve.' *Commonwealth v. Horton*, 434 Mass. 823, 832, 753 N.E.2d 119 (2001), quoting from *Commonwealth v. Gordon*, 422 Mass. 816, 823, 666 N.E.2d 122 (1996). The defendant, however, was present during the individual voir dire and had access to the jury questionnaire containing the names and other pertinent information for each individual to be questioned. Furthermore, '[t]he principal concern behind the requirement of a public trial is the assurance of fairness.... [Yet the defendant] does not allege that the jury selection process was unfair in any respect, let alone identify some form of unfairness that would have been prevented had the voir dire been conducted' completely in public. *Commonwealth v. Horton*, supra. He also never objected to the process at trial . . .

....

> The judge here followed the procedure approved by the United States Supreme Court when she permitted prospective jurors to make an affirmative request for privacy during voir dire. See *id.* at 512, 104 S.Ct. 819 ('To preserve fairness and at the same time protect legitimate

privacy, a trial judge . . . should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record'). Furthermore, the interests of individual members of the venire in maintaining their privacy while providing the court and the parties extremely sensitive information about their beliefs and life experiences was an overriding one. The judge's balancing of the competing interest in a public trial was appropriate and her solution to the problem narrowly tailored: she allowed the courtroom to be closed in response only to specific requests made by potential jurors to protect their privacy, and only during the discussion of private matters; she immediately reopened the courtroom for any additional questioning of each of the potential jurors once questioning on the private matters was completed. She also adequately articulated the basis for the brief closures in order to permit meaningful appellate review. See *Press-Enterprise Co. v. Superior Ct. of Cal.,* 464 U.S. at 510. We conclude that the defendant's arguments on this issue have no merit.

*Jaynes*, 55 Mass. App. Ct. at 310-13, 770 N.E.2d at 490-92.

In his habeas petition, Jaynes claims that the MAC's decision amounted to an unreasonable application of federal law in the following respects: first, he

says that clearly established Supreme Court precedent requires that "the *party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced*," and that here, the MAC upheld the closure based on "interests asserted *sua sponte* by the trial court," (#45 at 32), and not by a "party"; second, under *Waller* the trial court "*must* consider reasonable alternatives to closing the proceeding," but here the trial court did not consider alternatives; and 3) the trial court did not articulate her findings on the courtroom closure with respect to every closure. (*See* #45 at 32)(emphasis original).

The Court concludes that the MAC's resolution of the claim did not amount to an unreasonable application of clearly established federal law. First, as the MAC point outs, the trial court followed almost verbatim the prescription set out in *Press-Enterprise Co.*, for handling concerns of juror privacy: individual jurors "may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record." *Jaynes*, 55 Mass. App. Ct. at 312, 770 N.E. 2d at 492. Here, the courtroom closures involved precisely these instances where jurors requested privacy, the trial judge considered the legitimacy of the request (and whether indeed closing the courtroom was warranted), and, where warranted, the judge closed the courtroom with counsel

and defendant present and on the record.

The Court disagrees that clearly established law necessarily requires a "party" in the strict sense to request the closure or that it would have amounted to an unreasonable application of Supreme Court law for the MAC to conclude that a constitutional violation had occurred because the trial judge *sua sponte* ordered the closing[6]; and the MAC did not unreasonably apply clearly established law in concluding that the trial judge's findings passed constitutional muster. Furthermore, in *Waller*, the question presented was "the extent to which a hearing on a motion to suppress evidence may be closed to the public over the objection of the defendant." *Waller*, 467 U.S. at 41. Here, the defendant did not object to the trial judge's procedure. Further, it was not unreasonable for the trial judge to close the courtroom for brief periods during the individual voir dire after determining the legitimacy of the individual jurors's request: unlike in *Waller*, the closures were brief and no broader than necessary to ensure the juror would answer questions candidly. (In *Waller*, by contrast, the trial court closed the courtroom for the entirety of a suppression

---

[6]

In *Presley*, the Supreme Court examined an instance when a trial judge *sua sponte* asked the courtroom's lone observer (the defendant's uncle) to leave the courtroom during voir dire. Throughout the decision the Supreme Court makes no issue of the fact that the closure of the courtroom was done *sua sponte*. 558 U.S. 209 (2010).

hearing, which lasted seven days; in *Press-Enterprise Co.,* the voir dire was closed to the public for six weeks.)

### GROUND 4:

### Ineffective Assistance of Trial Counsel

The petitioner also claims that he is due relief because his Sixth Amendment right to the effective assistance of counsel has been violated by numerous failings on the part of trial counsel. This court will address each of the petitioner's contentions in turn.

*A. Failure to file a motion to suppress*
*the results of the inventory search of the vehicle.*

Petitioner argues that the MAC was incorrect when it denied the petitioner's ineffective assistance of counsel claim.[7] The petitioner argues that trial counsel was ineffective for failing to file a motion to suppress the evidence seized from the search of the petitioner's car and apartment.

---

[7]

Petitioner's ineffective assistance of appellate counsel claim is merely a variation of his ineffective assistance of trial counsel claim. "When an ineffective assistance of counsel claim rests on the deficient selection of appellate issues, the primary, if not single, focus of the court is the merit or lack thereof of the unraised issues." *Rosenthal v. O'Brien,* 814 F. Supp.2d 39, 57 (D.Mass. 2011). It is well settled that *Strickland* applies to claims against appellate counsel, therefore denial of the ineffective assistance of trial counsel claims will necessarily lead to denial of the ineffective assistance of appeallate counsel claim. *Id.* For the sake of judicial economy, this court will address the merits of the underlying ineffective assistance of trial counsel claim. *Rosenthal v. O'Brien,* 713 F.3d 676, 688 (1st Cir. 2013)(upholding district court's finding that ineffective assistance of appellate counsel claim was merely a variation of ineffective assistance of counsel claim), cert. *denied,* 134 S.Ct. 434 (2013).

On October 2, 1997 at approximately 5:15 p.m., Officer John Geary arrested Charles Jaynes at Honda Village. (Tr. 1741) Following the arrest of Jaynes, Detective Edward Aucoin was assigned to tow the car the petitioner typically drove from where it was parked on Thornton Street, which runs parallel to Honda Village, to the Newton Police Department. (Tr. 1777) After the car arrived at the Newton police garage, Aucoin and Detective McCarthy conducted an inventory search of the vehicle pursuant to Newton police department policy. (Tr. 1778) The search revealed key pieces of evidence that would become central to the prosecution of the petitioner. The evidence included a wallet with a New Hampshire drivers license issued to Anthony Scaccia with the address 1101 Elm Street, Manchester, New Hampshire. (Tr. 1780) The driver's license had the petitioner's picture on it. *Id.* Other items produced from the search included a receipt for a storage container from Bradlees, a receipt from Home Depot for concrete and lime, and a receipt from International Bicycle in Newton. (Tr.1786-1788)

The petitioner argues that the evidence obtained from this inventory search played a critical role in the prosecution's case, and that it was used to obtain a warrant not only to search the car again but also to search Jaynes'

Manchester apartment. (#45 at 35) Petitioner argues that trial counsel's failure to file a motion to suppress this evidence constituted ineffective assistance of counsel. It is petitioner's contention that the impoundment of the petitioner's car was an unconstitutional seizure in violation of the Fourth Amendment, and that the evidence subsequently found from the search of the defendant's car and apartment are fruit of the poisonous tree. Petitioner argues that a motion to suppress could have been successful, and that without the suppressed evidence, the outcome of the trial may have been different. (#45 at 45)

The failure to file a motion to suppress was first raised by the petitioner in his Second Motion for a New Trial. (#39, S.A. 498) Given that there were no findings of fact, the MAC drew the facts from the trial and the record on appeal.

The pertinent facts, as found by the MAC, are as follows:

> At about 5:15 P.M., on October 2, 1997, Officer John Geary was dispatched to Honda Village, in Newton for a disturbance. Both the defendant and his father worked there preparing cars for sale. Upon his arrival, Geary observed the defendant engaged in a verbal altercation with five other men, including the codefendant and two of the victim's older brothers; the dispute had something to do with the victim, who had been reported missing the previous evening.

*Commonwealth v. Jaynes*, 55 Mass.App.Ct. at 304. The defendant was arrested, brought to the police station and booked between 5:45 P.M. and 6:00 P.M.[4] The automobile he regularly used, a 1983 grey Cadillac that was owned by his father, remained behind, parked near Honda Village. See generally *Commonwealth v. Jaynes*, 55 Mass.App.Ct. at 302-304; and *Commonwealth v. Sicari*, 434 Mass. at 735.

The police began to question the defendant at about 6:45 P.M. regarding the disappearance of the victim and his own whereabouts during the previous forty-eight hours. The defendant admitted having befriended the victim, but claimed he had last seen him three days earlier, on September 29, 1997, and lied to police about not having an apartment in New Hampshire. Simultaneously, police were separately questioning the codefendant about the victim's disappearance and the defendant's relationship with the child. *Commonwealth v. Sicari*, 434 Mass. at 739-740. At the time of these interviews, the victim was still missing and the police did not know whether he was dead or alive.[5] See *Commonwealth v. Sicari*, 434 Mass. at 738-739.

During this same period, between 5:30

---

[4]

The MAC inserted a footnote which stated "We know from the record, though the jury did not, that the defendant was arrested on unrelated, outstanding warrants."

[5]

The MAC inserted a footnote which stated "The codefendant did not confess to the murder and implicate the defendant until about 1:30 A.M. on October 3, 1997. *Commonwealth v. Sicari*, 434 Mass. at 734. The victim's body was not located and recovered until October 7, 1997. *Commonwealth v. Jaynes*, 55 Mass.App.Ct. at 303."

P.M. and 6:30 P.M. on October 2, 1997,
Detective Edward Aucoin of the Newton police
department was dispatched to the Cadillac's
location 'along with a tow vehicle to have it
towed . . . to the police garage for an inventory
search.' The vehicle was parked on Thornton
Street (which runs along side Honda Village)
where parking is permitted for two hours. The
Cadillac had been there since at least 5:00 P.M.
that afternoon. At about 8:00 P.M., the vehicle
was towed to the garage and shortly thereafter,
Aucoin conducted an inventory search of the
vehicle in accordance with a written policy of the
Newton Police department.[6][7]

*Jaynes*, 2010 WL 2813572 at *3.

Under AEDPA a state court's determination of an ineffective assistance of

counsel claim is evaluated under the "unreasonable application" clause of §

2254(d). Section 2254(d) states that a writ of habeas corpus may not be

---

[6]

    The MAC inserted a footnote which stated "It cannot be definitely ascertained from the record
whether the search was conducted before or after the vehicle was towed, but it is clear that the search was
nearly contemporaneous with that event and executed pursuant to a written inventory policy of the Newton
police department. An inventory of a vehicle's contents after it has been impounded is not only permitted
but prudent to safeguard the contents of the vehicle and to protect the police form any claim of wrongdoing.
*See generally, Commonwealth v. Matchett*, 386 Mass. 492, 509-510, (1982)."

[7]

    The MAC inserted a footnote which stated "Among the items discovered during the search and
admitted in evidence at trial were the following: 1) a wallet with a New Hampshire driver's license
containing a photograph of the defendant with the name Anthony Scaccia and an address of 1101 Elm Street,
Manchester, New Hampshire, 2) several other cards in the wallet displaying the name Anthony Scaccia, 3)
a credit card receipt for lime and concrete purchased from Home Depot dated October 1, 1997, 10:21 P.M.,
4) a cash receipt from International Bicycle for a bike, 5) a credit card receipt for No Doz from Osco Drugs
purchased on October 1, 1997, 10:33 P.M., 5) a credit card receipt from Bradlees for a storage container, and
6) a plastic bag from NHD containing two rolls of duct tape."

granted unless the State court decision "involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(1) and (2); *Williams,* 529 U.S. at 409 (mixed questions are reviewed under § 2254(d)(1)'s "unreasonable application" clause).

The Supreme Court recently reinforced the deferential standard that applies to a section 2254 claim based on ineffective assistance of counsel. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard . . . A State court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington v. Richter*, 562 U.S.86, __, 131 S.Ct. 770, 785 (2011). This standard has also been called "doubly deferential." *Knowles,* 556 U.S. at 123 (doubly deferential judicial review applies to a *Strickland* claim evaluated under § 2254(d)); *Yarborough*, 540 U.S. at 6 (judicial review of attorney is doubly deferential when conducted through the lens of federal habeas); *Jewett v. Brady*, 634 F.3d 67, 75 (1st Cir.

2011)("The Supreme Court has recently reinforced the 'doubly' deferential standard that applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied the *Strickland* principles.").

In its decision, the MAC found that "[i]n these circumstances, the police were permitted to impound the vehicle," and that:

> [i]n view of the circumstances, we are persuaded that there was no likelihood that a motion judge would have concluded that the search of the Cadillac was improper and therefore, a motion to suppress would not likely have been successful. Counsel is not ineffective for failing to pursue a motion with little chance of success. Because we reach this conclusion, there is no basis upon which to consider that any subsequent search was tainted.

*Jaynes*, 2010 WL 2813572 at *4 (internal citations omitted). The MAC based its analysis on *Commonwealth v. Saferian*, 366 Mass. 89, 315 N.E.2d 878 (1978). The First Circuit has noted on several occasions that even if the SJC does not cite to *Strickland* that "the *Saferian* standard is 'functionally identical to the federal standard.'" *Smiley v. Maloney*, 422 F.3d 17, n.2 (1st Cir. 2005)(quoting *Mello v. DiPaulo*, 295 F.3d 137, 144 (1st Cir. 2002)); *Ouber v. Guarino*, 293 F.3d 19, n.8 (1st Cir. 2002) ("We have indicated that the *Saferian* standard is roughly the equivalent to the *Strickland* standard.")(internal

citations omitted).

The main thrust of the defendant's argument is that the MAC misapprehended the facts of the case when it found that the car had been parked illegally. "As these facts are fatal to the factual premise of the MAC's analysis, the decision that trial counsel was not ineffective 'was based on an unreasonable determination of the facts in light of the evidence presented in State court . . .'". (#52 at 4-5)(quoting 28 U.S.C. §2254(d)(2))   Under AEDPA the petitioner bears a heavy burden when challenging the factual findings of the State court.  The "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[8] In support of his contention that the car was not parked illegally, the petitioner cites to Trial Exhibit 84 (#42-1) which is a picture of the Thornton street parking sign, the testimony of Jason Drew, an employee of Honda Village who also parked his car on Thornton Street, and the testimony of Detective Edward Aucoin, the Newton police officer who was sent to tow the

---

[8]

"The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007) (citing *Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003) (quoting *Sumner v. Mata*, 455 U.S. 591, 593 (1982)(quotations omitted in original)), *cert. denied*, 553 U.S. 1098, 128 S.Ct. 2915 (2008).

vehicle from Honda Village.

The petitioner also cites to the City of Newton Traffic and Parking Regulations, Article I, Section TRP-176 (#42-1) as well as to the affidavits of Jayne Lawton and Attorney Pumphrey. (#45-1, #45-2)   The City of Newton Traffic and Parking Regulations were attached to a Petition for Rehearing and were not put before the MAC during its consideration of the petitioner's appeal. Likewise the affidavits of Jayne Lawton and Attorney Pumphrey were submitted before this court, but were not submitted to the MAC.  In reviewing a state court decision under AEDPA, this court may not look at materials that were not put before the MAC.  The record is limited to that which is properly before the MAC. "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1400 (2011).

Petitioner argues that *Cullen* does not bar an evidentiary hearing once the requirements of section 2254(d)(2) are met.  However, the affidavits of Lawton and Pumphrey, as well as the City of Newton Traffic and Parking Regulations

cannot be used to determine whether the facts, as determined by the MAC are unreasonable under section 2254(d)(2). In *Cullen*, the Court specifically held that "evidence introduced in federal court has no bearing on §2254(d)(1) review." *Cullen*, 131 S.Ct. at 1401. The First Circuit has since clarified that *Cullen* requires that review of the "fact" prong of Section 2254(d)(2) be limited to the record that was before the state. *Garuti v. Roden*, 733 F.3d 18, 23 (1st Cir. 2013) ("This court has noted specifically that '[r]eview under the 'fact' prong [i.e., Section 2254(d)(2)] is limited to the record that was before [the] state court.") (quoting *Brown v. O'Brien*, 666 F.3d 818,822 n.3 (1st Cir. 2012)).

Likewise, the evidence submitted in the petition for rehearing cannot be used in a section 2254(d) analysis. The petitioner submitted the City of Newton Traffic and Parking Regulations on August 2, 2010 after the court had already ruled on the merits of the petitioner's claims. (#42-1) Habeas review is limited to the record that was before the state court at the time the state-court decision was made. *Cullen*, 131 S.Ct. at 1398. Following *Cullen*, the First Circuit has specifically found that a federal court may not hear new evidence if the state

court declined to give the petitioner a hearing on such evidence.[9]  *Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011), *cert. denied,* 132 S.Ct 446 (2011); *see also, Garuti*, 733 F.3d at 23 (State court denied evidentiary hearing on ineffective assistance claim.  Petitioner argued that the state court decision was based on an incomplete record and therefore was an objectively unreasonable determination of the facts.  The First Circuit found that *Cullen* bars an evidentiary hearing at the district court on those facts.); *Gendreau v. Dickhaut*, 2013 WL 914642, *3 (D. Mass. 2013)("Inasmuch as petitioner seeks review under section 2254(d)(1) *Cullen* forecloses his ability to supplement the state court record in an evidentiary hearing.").

The MAC's determination of the facts cannot be said to be unreasonable in light of the evidence presented in the state court proceeding.  Nor has the petitioner shown by clear and convincing evidence that the trial court's decision was unreasonable.  While the picture of the parking sign on Thornton Street may well suggest that there were no parking regulations after 7 P.M., the sign is itself not conclusive of that fact.  Likewise, the testimony of Jason Drew is not

---

[9]

It is important to note that the MAC had a hearing on these claims on March 9, 2010.  During that hearing petitioner did not provide the evidence which he subsequently sought to produce in his petition for rehearing.  (Transcript of State Court Hearing from March 9, 2010)

dispositive. Drew testified as to his parking habits; he did not testify as to the parking regulations on Thornton Street. (Tr. 1429-1452) Furthermore, Drew only testified that he saw Jaynes' car on the street on October 1, 1997, the day that Jeffrey Curley was murdered. Drew did not offer any testimony as to Jaynes' car on October 2, 1997, the day it was towed. (Tr. 1429-1452) Nor did Drew say what happened when a car was left on the street past 7 P.M. His testimony was limited to stating that on October 1, 1997 he "probably" moved his car at 3 P.M. and at 5 P.M. (Tr. 1451) The record before the state court was silent as to what happened to cars left on Thornton Street after 7 P.M.

The only other testimony regarding parking on Thornton Street came from Detective Edward Aucoin. Aucoin testified that after 5:15 p.m. on October 2nd he learned that Jaynes had been arrested. (Tr. 1776) Thereafter Aucoin " was assigned to go down to that location along with a tow vehicle to have it towed from Thornton Street back to the police garage for an inventory search." (Tr. 1777) When asked what an inventory search was, Aucoin stated "[a]n inventory search is a policy established by the Newton police department, which in the event of an arrest or other situations where a vehicle is towed, an inventory report is made out on the vehicle for a couple of reasons . . ." (Tr. 1778) Aucoin did not offer any testimony as to why the car was towed, who

made the request for him to tow the vehicle, or whether there was any further discussion regarding the towing of the vehicle from either fellow police officers or anyone at Honda Village. Aucoin stated that the car was eventually towed "probably sometime probably close to eight o'clock." *Id.*

The petitioner argues that Aucoin was sent to Honda Village to tow the vehicle, and that he waited almost three hours before actually towing it as a ruse. "[A]ny parking violation was subterfuge. As Jaynes put it before the MAC, 'The police tow truck arrived at 5:30 p.m., and waited until 8 p.m. to tow the Cadillac. In other words, the two [sic] truck waited for two and a half hours so that the officers could attempt to justify a parking violation." (#45 at 42) Petitioner, however, is assuming facts that were not in evidence. Officer Aucoin did not testify when the tow truck arrived at Honda Village; he only testified that he arrived at Honda Village at 5:30. (Tr. 1777) It could reasonably be argued that Officer Aucoin was dispatched to have the vehicle towed pursuant to the arrest of the driver, and that he waited at Honda Village to safeguard the vehicle pending the arrival of the tow truck. As the MAC stated, Jaynes "who was under arrest, was unable to move the vehicle that was now in violation of that parking restriction and the record does not reveal that

anyone else had come forward to take possession of the vehicle." *Jaynes,* 2010 WL 2813572 at *4. Likewise Officer Aucoin did not say whether the car was parked legally. The record is silent as to the exact reasons for the car being impounded.

Under Supreme Court law, there is a community caretaking exception to the Fourth Amendment warrant requirement where police are allowed to impound a vehicle for noninvestigatory purposes when it is reasonable to do so. *United States v. Sanchez,* 612 F.3d 1, 4 n.2 (1st Cir. 2010) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct.2523 (1973)), *cert. denied*, 131 S.Ct. 621 (2010). "Courts have regularly upheld warrantless vehicle impoundments when police are acting not as investigators but as community caretakers, responsible for protecting public safety and preventing hazards by removing vehicles that impede traffic, risk vandalism, or create inconvenience." *Sanchez,* 612 F.3d at 7 (Lynch, concurring). The impoundment of a vehicle after the operator was arrested for "an indeterminate, and potentially lengthy, period," has been found to be reasonable under this community caretaking exception. *United States v. Coccia*, 446 F.3d 233, 240 (1st Cir. 2006), *cert. denied,* 549 U.S. 1149, 127 S.Ct. 1021 (2007); *Vega–Encarnacion v. United States*, 344 F.3d 37,

41 (1st Cir.2003) ("Caselaw supports the view that where a driver is arrested and there is no one *immediately* on hand to take possession, the officials have a legitimate non-investigatory reason from impounding the car.")(emphasis original). The First Circuit has noted that the "critical question in cases such as this is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitiously, but whether the decision to impound and the method chosen for implementing that decision were, under all circumstances, within the realm of reason." *United States v. Rodriquez-Morales*, 929 F.2d 780, 786 (1st Cir. 1991) *cert. denied,* 502 U.S. 1030, 112 S.Ct. 868 ( 1992).

Impoundments by the police may be in furtherance of "public safety" or "community caretaking functions," such as removing "disabled or damaged vehicles," and "automobiles which violate parking ordinances, and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *South Dakota v. Opperman,* 428 U.S. 364, 368-69, 96 S.Ct. 3092, 3096-97 (1976). "An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation." *United States v.*

*Duguay*, 93 F.3d 346, 352 (7ᵗʰ Cir. 1996) (quoting *Opperman*, 428 U.S. at 368-69), cert. denied 526 U.S. 1029, 119 S.Ct. 1274 (1999).

The Supreme Court has also held that an inventory search of an impounded vehicle is not unreasonable under the Fourth Amendment if carried out in accordance with standard procedures, and if there is no suggestion that the procedure was a pretext for concealing an investigatory police motive. "The Supreme Court itself has held that police may impound a car . . . provided they make their impoundment decision 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *United States v. Romas-Morales*, 981 F.2d 625, 626 (1ˢᵗ Cir. 1992) (quoting *Colorado v. Bertine*, 479 U.S. 367, 375, 107 S.Ct. 738, 743 (1987), *cert. denied,* 508 U.S. 926, 113 S.Ct. 2384 (1993).[10]

The MAC decision cannot be viewed as an unreasonable application of clearly established Federal law as determined by the Supreme Court. The MAC cited to several Massachusetts' cases which have provided the standard for evaluating inventory searches of automobiles. For instance, the court cited to

---

[10]

Impounding a car pursuant to the community caretaking doctrine is not invalidated merely because the police also have a desire to investigate crime. "A search or seizure undertaken pursuant to the community caretaker exception is not infirm merely because it may also have been motivated by a desire to investigate crime." *Coccia*, 446 F.3d at 240-41.

*Commonwealth v. Matchett*, 386 Mass. 492, 509-10, 436 N.E.2d 400, 411 (1982)

for the premise that an inventory search is not only permitted but prudent to

safeguard the contents of the vehicle and to protect the police from any claim

of wrongdoing. *Jaynes,* 2010 WL 2813572 at *3. As the court found in

*Matchett*, an inventory search of an impounded vehicle is reasonable if carried

out in accordance with standard procedures, and if there is no suggestion that

the procedure was a pretext for concealing an investigatory police motive.

*Matchett*, 386 Mass. at 509-10, 436 N.E. 2d at 411.[11] The court also noted that

impoundment of a car has been upheld when accompanied by "'such

circumstances as threats of vandalism, parking restrictions, police liability

concerns, or the inability of the defendant or another to latter move the car.'"

*Jaynes*, 2010 WL 2813572 at *3 (quoting *Commonwealth v. Brinson*, 440 Mass.

609, 613 (2003)). As in this case, police may lawfully impound a vehicle when

it would otherwise remain on the side of a city street. *United States v. Exume*,

953 F.Supp.2d 319, 323 (D. Mass. 2013) ("the police may lawfully impound a

vehicle in order to protect it from theft or vandalism when it would otherwise

---

[11]

    Officer Aucoin testified that "[a]n inventory search is a policy established by the Newton police department, which in the event of an arrest or other situations where a vehicle is towed, an inventory report is made out on the vehicle for a couple of reasons . . ." (Tr. 1778) Officer Aucoin further stated that there was a written inventory policy at the Newton police station. *Id.*

remain on the side of a public highway or city street.").

Despite the arguments made by the petitioner, he has not provided clear and convincing evidence that the MAC's determination of the facts were unreasonable. While the record on the circumstances of the towing was light, petitioner has failed to overcome the high burden imposed by AEDPA to overcome a state court's factual determination. "State court findings of fact are "'presumed to be correct" unless the petitioner rebuts this "presumption of correctness" with "clear and convincing evidence."'" *Jewett*, 634 F.3d at 75 (quoting *Yeboah-Sefah*, 556 F.3d at 66 (quoting 28 U.S.C. § 2254(e)(1))). Further, under the two pronged *Strickland* test, there is no reasonable claim for ineffective assistance of counsel if there was no prejudice. Had defense counsel moved to suppress the inventory search, it is unlikely that such a motion would have been successful. Therefore there is no prejudice.[12]

---

[12]
Likewise there is no prejudice given that there was a search warrant issued for the car at 3:00 a.m. on October 3, 1997. (#39, S.A. 790) Contrary to the petitioner's contention that the search warrant "relied upon the results of an illegal search," (#52 at 7), the police likely had enough probable cause without the evidence from the car to get a warrant. "As a general matter, probable cause exists when the police have (I) reliable information that a crime has been committed and (ii) sufficient reason to believe that they have come across evidence of it." *Sanchez*, 612 F.3d at 5. Once at the police station, Jaynes told police that he knew Jeffrey Curley, that he had given him a ride in his car, that Jeffrey's parents didn't know of their relationship, and that he never asked Jeffrey's parents for permission to take Jeffrey out. (Tr. 1822-23), Jaynes also made a statement to Trooper Hunte that "I could help you find Jeffrey Curley." (Tr. 1794) The MAC also knew that Richard Farhat, the manager at Honda Village, had told the Newton Police that he had seen Jeffrey Curley with Jaynes on September 27, 1997, a mere five days before Jeffrey disappeared. (#39, S.A. 800 at ¶4) Each of these independent pieces of evidence could have formed the probable cause necessary for a warrant to search the car. The actual application for the search warrant contained the

Even if the appellate court was incorrect in its factual finding that the car was parked illegally, the MAC's finding that it was nonetheless a lawful impoundment is not contrary to clearly established federal law. The MAC cited *Commonwealth v. Matchett* which has accurately identified Supreme Court principles.[13] "The Supreme Court of the United States has held that an inventory search of an impounded motor vehicle is not unreasonable under the Fourth Amendment to the Constitution of the United States if carried out in accordance with standard procedures and if there is no suggestion that the procedure was a pretext concealing an investigatory police motive." *Matchett*, 386 Mass. at 509-510, 436 N.E.2d at 411. It was not an unreasonable application of federal law for the MAC to find the car could have been lawfully impounded and that there was no ineffective assistance of counsel claim. "The community caretaking doctrine gives officers a great deal of flexibility in how

---

affidavit of Detective Aucoin detailing the inculpatory statement of Salvatore Sicari that Jaynes murdered Jeffrey Curley in the backseat of the car, and that Sicari and Jaynes disposed of the body. (#39, S.A. 793 at ¶12) At 12:30a.m. on October 3, 1997, a mere four and a half hours after the car had been towed, Salvatore Sicari told the police that Charles Jaynes had smothered Jeffrey Curley in the back seat of the vehicle. (#39, S.A. 793 at ¶12, #39, S.A. 802 at ¶11)

[13] The First Circuit has noted that it is not necessary for state court decisions to cite to federal cases. *Clements v. Clarke*, 592 F.3d 45, 54 (1st Cir. 2010), cert. denied 130 S.Ct. 3475 (2010) ("The real question is not whether the state court opinion cited to any federal cases, but whether the opinion addresses a fairly raised federal issue."); *Zuluaga v. Spencer*, 585 F.3d 27, 31 (1st Cir. 2009) ("[I]t would elevate form over substance to impose some sort of requirement that busy state judges provide case citations to federal law . . . before federal courts will give deference to state court reasoning.").

they carry out their community caretaking function. The ultimate inquiry is whether, under the circumstances, the officer acted 'within the realm of reason.'" *Lockhart-Bebery v. Sauro*, 498 F.3d 69, 75 (1st Cir. 2007)(citing *Rodriguez-Morales*, 929 F.2d at 786).

Petitioner contends that Edward Jaynes, the owner of the car and father of the petitioner, should have been contacted before the police removed the car. Edward Jaynes's submitted an affidavit to the MAC. (#39, S.A. 788) In his affidavit Edward Jaynes stated that:

> 3. On October 2, 1997, my Cadillac was parked at Honda Village while I was at work.
> 4. At about 5:30 p.m., the police came to Honda Village and arrested my son, Charles.
> 5. I never gave the police permission to search my car, but they searched it anyway.
> 6. They took my car and impounded it.
> 7. They removed several items from the car.

*Id.*

While the affidavit states that Jaynes was at Honda Village on October 2, it does not shed any light on the towing of the vehicle. Edward Jaynes does not state that he offered to remove the car from the roadway, or that he objected to the

towing of the vehicle.[14]  As the Supreme Court has made clear, the Fourth Amendment does not require a police officer to find alternative arrangements before impounding a vehicle after the driver was arrested.  "And while giving Bertine an opportunity to make alternative arrangements would undoubtably have been possible, we said in *Lafayette*: '[T]he real question is not what "could have been achieved," but whether the Fourth Amendment *requires* such steps . . .'" *Colorado v. Bertine*, 479 U.S. 367, 373-74; 107 S.Ct. 738, 742 (1987) (quoting *Illinois v. Lafayette,* 462 U.S. 640, 647; 103 S.Ct. 2605, 2610 (1983) (emphasis original); *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 76 (1st Cir. 2007)("There is no requirement that officers must select the least intrusive means of fulfilling community caretaking responsibilities.").

Given the cases which permit impoundment of vehicles in circumstances similar to those present here, it was not unreasonable for the MAC to find that a motion to suppress would be futile.  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

---

[14]

The Petitioner argues that Edward Jaynes' affidavit that was submitted in the motion for new trial provided the evidence necessary to support a hearing on these issues; the affidavit however does not rise to the level of clear and convincing evidence.

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786-87. Further, it cannot be said that trial counsel's failure to file a motion to suppress was an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S.Ct. at 786 (internal citation omitted).

The end of the matter is simply that the petitioner has not met his burden to show by clear and convincing evidence that the MAC findings of fact were unreasonable.

## B. Failure to file a motion to suppress the apartment search

Petitioner argues that the search of Jaynes' apartment, which yielded a number of highly damaging pieces of evidence, was in violation of the Fourth Amendment. The first bases by which the petitioner challenges the apartment search centers on the affidavit that was used in the warrant application. According to the petitioner, the affidavit included information from the search

of the car, and had defense counsel challenged the search of the car, that information would have had to be excised from the warrant in order to test its legality. (#45 at 46)    As discussed above, however, the MAC did not unreasonably apply the *Strickland* standard when evaluating the failure to file a motion to suppress the search of the car.    Given that the petitioner's ineffective assistance of counsel claim based on the failure to file a motion to suppress the car is without merit, so too is this ancillary claim.

The petitioner also argues that even if the car search was legal, the "nexus element" of a warrant application was not met under the circumstances presented here. (#45 at 46)   The nexus element of a warrant application requires that there is probable cause to believe that the place to be searched will produce the evidence described in the application.   "A valid warrant application must establish that there is probable cause to believe that the evidence described in it will be found in the place to be searched." *United States v. Lyons*, 740 F.3d 702, 723 (1st Cir. 2014) (citing *United States v. Feliz,* 182 F.3d 82, 86 (1st Cir. 1999)).   The petitioner's contention is wholly without merit.   Within the warrant application, State Police Trooper Peter J. Sennott, attested that Jaynes said he had driven to New Hampshire with Sicari on the night of

October 1, 1997. (#39, S.A. 801 at ¶8) Sennott further stated that in Jaynes' grey Cadillac they found a driver's license with Jaynes' picture on it, but with the name Anthony J. Scaccia. Also contained within the car was the receipt for lime and concrete that was purchased at 10:21 P.M. on October 1, 1997, a receipt for a storage container purchased on October 1, 1997, an envelope containing pornographic magazines from NAMBLA (North American Man-Boy Love Association) that was addressed to Anthony J. Scaccia, and an empty wrapper from a roll of duct tape. (#39, S.A. 801 at ¶9) The affidavit further stated that Sicari confessed to taking Jeffrey's body to Jaynes' New Hampshire apartment where they removed Jeffrey's clothes and prepared the body for disposal. (#39, S.A. 802 at ¶12)

Petitioner's contention that the failure to tie the address searched in New Hampshire with Jaynes' New Hampshire driver's license is not availing. The affidavit stated that Janet Aldrich of Gamache Realty confirmed that Anthony Scaccia rented an apartment at 1101 Elm Street in Manchester. (#39, S.A. 802 at ¶13) Given the statements made by both Jaynes and Sicari about their presence in New Hampshire the night that Jeffrey Curley went missing, the affidavit fully supported an issuance of a warrant for the search of the apartment. Probable cause is found when "police have (I) reliable information

50

that a crime has been committed and (ii) sufficient reason to believe that they have come across evidence of it." *Sanchez,* 612 F.3d at 5. To succeed on this claim, Jaynes would need to show that the MAC's denial of the ineffective assistance of counsel claim for failure to file a motion to suppress the apartment search was "contrary to clearly established federal law." No such showing has been made here.

### C. Failure to object to burden-shifting manslaughter instruction, failure to request an instruction on jurisdiction, and failure to object to court room closing.

The petitioner also argues that trial counsel was ineffective for failing to object to the burden-shifting manslaughter instruction,[15] failing to request an instruction on jurisdiction, and failing to object to the closing of the courtroom during voir dire. The petitioner claims that because the MAC treated these ineffective assistance of counsel claims cursorily and did not address the full substance of the petitioner's arguments, that these claims were not adjudicated on the merits and de novo review is required. (#45 at 50) Contrary to the petitioner's argument however, the Supreme Court in *Harrington* specifically stated that even a summary denial is an adjudication on the merits. *Harrington,*

---

[15] The court has already addressed petitioner's claim for ineffective assistance of counsel based on the burden shifting manslaughter instruction. *See* Section C, Ground One, *supra.*

131 S.Ct. at 785 ("This Court now holds and reconfirms that §2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").  The First Circuit has recently reiterated this holding.  "Federal habeas courts must apply a rebuttable presumption that any federal claim properly brought before the state court and thereafter rejected was 'an adjudication on the merits' for AEDPA purposes.  This is so even if the state-court opinion does not expressly address the issue." *Magraw v. Roden*, 743 F.3d 1, 10 (1st Cir. 2014) (internal citation omitted).  Thus, review of petitioner's claims of ineffective assistance of counsel are analyzed under the doubly deferential standard.

Petitioner claims that trial counsel's failure to request an instruction on jurisdiction constituted ineffective assistance of counsel.  The petitioner argues that "[t]he trial judge erred by failing to instruct the jury that, in order to obtain a murder conviction, the Commonwealth had to prove beyond a reasonable doubt that the violence or injury from which Jeffrey's death ensued occurred in Massachusetts." (#45 at 23)  In its decision, the MAC noted that the underlying theory of this claim had already been addressed by the MAC in its decision on the first motion for a new trial.  In that decision, the court noted "there was

conclusive evidence of the kidnapping of the child in Middlesex County, and all of the circumstantial evidence pointed to Massachusetts as the site of the murder." *Jaynes*, 55 Mass. App.Ct. at 309, 770 N.E.2d at 489.

Here, petitioner has failed to meet his burden to demonstrate that the MAC's determination of the facts are unreasonable in light of the evidence presented in the state court proceeding. Nor has the petitioner shown by clear and convincing evidence that the trial court's decision was unreasonable. None of the facts at trial gave rise to a reasonable inference that the victim was killed outside of Massachusetts, and while the evidence as to the exact time of the murder may have been vague, the MAC's decision cannot be said to be unreasonable.

Further, the petitioner has failed to show that there was prejudice created by the failure to instruct on jurisdiction. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Here the petitioner does not provide any evidence to show that the outcome of the trial would have been different. A defendant's failure to satisfy

one prong of the Strickland analysis obviates the need for a court to consider the remaining prong. *Turner v. United States*, 699 F.3d 578, 584 (1st Cir. 2012)("'[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.'")(quoting *Strickland*, 466 U.S. at 697)). As such, petitioner's claim for ineffective assistance of counsel based on failure to request a jurisdiction instruction fails.

The petitioner also argues that his defense counsel was ineffective for failing to object to the closing of the courtroom during the individual voir dire. This argument is also unavailing. Courts have long noted that defense counsel's interest in protecting the right to a public trial may give way in certain circumstances to other concerns, such as insuring that the accused have a fair chance of obtaining a favorable jury. *Horton v. Allen*, 370 F.3d 75, 82 (1st Cir. 2004), *cert. denied.* 543 U.S. 1093 (2005). Courts have upheld closing the courtroom during voir dire in cases where the questions were asked in order to elicit candor about any potential bias. *Id.* at 83 (questioning of potential jurors done in an anteroom so that they could be asked about racial prejudice); *see also, McGonagle v. United States,* 137 Fed. Appx. 373, 378 (1st Cir.

2005)(unpublished) ("counsel cannot be faulted for thinking that private questioning of the two venire members would be more conducive to eliciting candor about a possibly sensitive topic."), *cert. denied*, 546 U.S. 971, 126 S.Ct. 506 (2005). In this case, the court asked potential jurors to raise their hands if they had concerns

> that he or she feels may invoke issues of privacy in regard to these areas I have mentioned, that is, racial attitudes you may have, instances involving child sexual abuse involving you or any family member, or attitudes that you may have toward gay or homosexual people or any other areas that may create privacy problems for you? If anyone believes he or she has such concerns, please raise your hand now.

(Tr. 25-26)

Clearly, in this case the court's interest in closing the courtroom during limited portions of individual juror's *voir dire* was to elicit any potential bias concerning areas of critical importance to the case. Trial counsel's strategic decision to allow such questioning to take place in private does not rise to the level of ineffective assistance of counsel.

### D. Cumulative Failures

Petitioner also argues that defense counsel's other failings both

cumulatively and individually rise to the level of ineffective assistance of counsel. Specifically, the petitioner cites to defense counsel's failure to investigate the case or consult with experts, failure to review the evidence in the case, failure to obtain a transcript of Sicari's trial, failure to properly cross-examine a number of prosecution witnesses, and failure to move for a mistrial when a witness said it was strange that a black man would spend time with a white boy. (#45 at 52) Despite petitioner's protest, none of these arguments, either alone or lumped together rise to overcome AEDPA's double deference standard.

While petitioner argues that defense counsel was ineffective for failing to investigate or consult with experts, he provides no demonstration of prejudice other then bald assertions that "a defense could have been developed in trial that the Sicari brothers were responsible for Jeffrey's death." (#45 at 56) The petitioner must overcome the state court's decision under AEDPA's double deference standard, yet fails to even attempt to meet this burden. Petitioner fails to show that the decision of trial counsel fell below that of a reasonable attorney. *Strickland* "permits counsel to 'make a reasonable decision that makes particular investigations unnecessary.'" *Harrington*, 131 S.Ct. at 788. *See also*

*Dugas v. Copland*, 428 F.3d 317, 328-29 (1st Cir. 2005) ("We also recognize that reasonably diligent counsel are not always required to consult an expert as part of pretrial investigation in a case involving the use of expert witnesses by the state.")[16] Petitioner has failed to show that an investigation would have changed the outcome of the trial in any material way, as such his claim of ineffective assistance of counsel fails.

Petitioner also argues that defense counsel failed to review the evidence in the case. Specifically, petitioner cites to his failure to look at Jaynes' complete diary as well as the pictures of the cuts on Sicari's hands. This claim, however, is also without merit. "The Constitution guarantees only an 'effective defense, not necessarily a perfect defense or a successful defense.'" *Peralta v. United States*, 597 F.3d 74, 79 (1st Cir. 2010) (quoting *Scarpa v. Dubois*, 38 F.3d 1, 8 (1st Cir. 1994)). With regard to the diaries, the petitioner has failed to demonstrate what would have changed in his trial had defense counsel scoured them before they were admitted. Petitioner has failed to show that there was

---

[16]

In *Dugas*, the court found trial counsel's failure to consult with any experts constituted ineffective assistance of counsel. In contrast to the facts presented here however, in *Dugas*, the cornerstone of the defense was to challenge the state's determination that the case was arson. Despite serious questions regarding the prosecution's expert's analysis of the crime scene, the defense attorney did little to challenge those scientific conclusions. As the court found, there was a "distinct possibility that, if [defense counsel] had consulted an arson expert, the outcome of the trial would have been different." *Dugas*, 428 F.3d at 341. In this case, by contrast, there is no indication that consultation with experts would have changed the outcome of the case.

any prejudice that resulted from trial counsel's failure to review them. As for the pictures of the cuts on Sicari's hands, it was trial counsel who eventually got the pictures offered into evidence (Tr. 1661-1665) and who used them in his closing argument to argue that Sicari killed the victim. (Tr. 2222) Without more, petitioner has failed to meet AEDPA's burden to demonstrate that the MAC's rejection of these ineffective assistance of counsel claims was an unreasonable application of Federal law.

Likewise, petitioner's claim that defense counsel failed to review the transcript from the Sicari trial is unavailing. Trial counsel chose to pursue a speedy trial rather then delay for 16 months to obtain the entire Sicari transcript. (#39, S.A. 594-95) Instead, trial counsel got the testimony of the six pertinent witnesses. (#39, S.A. 594) Trial counsel's decision to move for a speedy trial rather then wait for a trial transcript is not an unreasonable strategic decision. "Where strategic choices are involved, reviewing courts must be careful not to lean too heavily on hindsight." *Janosky* 594 F.3d at 48. Further, petitioner fails to show prejudice that occurred from trial counsel's failure to receive a complete transcript. Petitioner fails to allege that the outcome of the trial would have been different had trial counsel received the

entire transcript.

Petitioner also argues that it was ineffective assistance of counsel for trial counsel to fail to move for a mistrial when a witness testified that it struck him as odd that a black man would spend time with a white boy. (Tr. 847-58, #45 at 53) The testimony, from Felix Ceasar, who was a car salesman at Honda Village came out as he described seeing Jeffrey Curley with Jaynes and Salvatore Sicari at the car dealership. Ceasar testified that he witnessed the victim playing with the petitioner "at least half a dozen times" at the dealership. (Tr. 853) He stated that "usually the little boy would be inside of a car together with Charles Jaynes and Sal Sicari would be on the outside and talking to him, he would be looking in. But it was always, it was always the little boy in and out of cars, or - well, he seemed to be having fun to me." (Tr. 853) While Ceasar stated that he thought it "a little strange in some circumstances" for them to be playing together, (Tr. 853), that he "never saw anything inappropriate." (Tr. 855) On cross-examination, trial counsel elicited from Ceasar that it was "just your opinion" that it was strange for a black man and a white boy to be playing together. (Tr. 856) Ceasar also stated that "I want to stress that I am not trying to say that is wrong; in fact, that would be very nice if it could be like that all the time . . ." (Tr. 856-57) While petitioner

argues that a motion for a mistrial was warranted after the comments by Ceasar, this court finds that the testimony was not unfairly prejudicial. "'Unfairly prejudicial evidence is evidence having some quality that moves the jury to attribute to it excessive probative value. It is evidence that triggers [the] mainsprings of human action [in such a way as to] cause a jury to base its decision on something other than the established proposition in the case.'" *United States v. Dunbar*, 553 F.3d 48, 59 (1st Cir. 2009) (quoting *United States v. Gonzalez-Vazquez*, 219 F.3d 37,47 (1st Cir. 2000) (alterations original, further citations omitted). The comments by Ceasar do not rise to the level of warranting a mistrial, and therefore trial counsel's failure to move for a mistrial was not unreasonable.

Petitioner also contends that trial counsel's poor performance on cross examination of witnesses constituted ineffective assistance of counsel. Petitioner argues that trial counsel attempted to impeach witnesses only to have the door opened to prior consistent statements. While trial counsel's cross-examination may not have been as effective as petitioner would have liked, it cannot be said to have risen to the level of a Sixth Amendment violation, and it was not unreasonable for the MAC to find that none of the instances cited by

the petitioner rise to the level of an ineffective assistance of counsel claim.

Lastly, the totality of the trial counsel's failings do not create a valid ineffectiveness claim. Because each of the individual claim fails, so too must the collective claims. *United States v. Rodriguez*, 675 F.3d 48, 66 n.20 (1st Cir. 2012) ("Because none of Rodriguez's claimed errors resulted in any substantial prejudice there was no cumulative error."); *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007) (holding that where none of the district court's "individual rulings worked any cognizable harm" to the defendant's rights, cumulative error argument was meritless), *cert. denied* 553 U.S. 1035, 128 S.Ct. 2424 (2008); *see also United States v. DeMasi*, 40 F.3d 1306, 1322 (1st Cir. 1994) ("Because we have found none of [the defendant's] individual complaints resulted in substantial prejudice and that most are completely without merit, we reject the final contention that his conviction was tainted by cumulative error."), *cert. denied* 513 U.S. 1132, 115 S.Ct. 947 (1995).

## GROUND 5:

### Improper Introduction of Inflammatory Evidence
### of Petitioner's Alleged Sexual Interest in Young Boys

Jaynes asserts that his due process rights were abridged when the trial court permitted the introduction of certain evidence. Specifically, Jaynes faults

the trial judge for admitting: 1) poetry and diary entries in which Jaynes describes his attraction to young boys, 2) testimony that Jaynes had said he was interested in a boy and a friend was going to hook him up with this boy, 3) testimony that Jaynes had a "strong interest" in NAMBLA, 4) testimony that Jaynes showed a witness a Swedish movie in which a young boy was naked in the shower, 5) testimony that Jaynes' co-defendant was going to hook Jaynes up with a six year old that liked to swallow, 6) testimony that Jaynes was attracted to young boys, and 7) a comment that Jaynes was a "pedophile." (#45 at 58-59, #53 at 724-728)  The Commonwealth sought to introduce the testimony and documentary evidence to show both that Jaynes had a plan and a motive and that the actions of October 1st 1997 were not isolated.

> In this case, we are attempting to show, and offering evidence to show the defendant's sexual attitude toward the victim and his motive for this crime . . . So the fact that he is sexually attracted to young boys is important to this case.  It puts this case into context.  It allows the jury to realize that this is not one isolated act on October 1st of 1997, it's not some random abduction or just the defendant innocently picking up Jeffrey Curley.  The jury is entitled to know, and the Commonwealth is entitled to present evidence that the defendant had a plan that day, the defendant intended to lure Jeffrey Curley into having sex with him.  The defendant's motive was to have sex with Jeffrey

Curley.

(#53, Ex. 12, p.10-11)

The trial court admitted the writings as relevant to linking Jaynes to Jeffrey Curley because some of the writings matched the description of Curley. (Tr. 733-36) The trial court also accepted the prosecution's argument that it had appropriately limited the amount of material the prosecution was introducing for the purpose of establishing Jaynes' predilections towards young boys. *Id.* at 735-36 In allowing the introduction of this evidence and testimony, however, the court gave a limiting instruction to insure that the jury would not impermissibly infer the defendant had a bad character or a propensity to commit crime. The limiting instruction specifically stated to the jury that this evidence could only be used for the purpose of the defendant's knowledge, intent, motive or method.

> So any of this testimony that you have heard about Mr. Jayne's interest in or attraction to young boys you may consider, if you believe such testimony, only for a limited purpose: That is, for the purpose of establishing, if you believe that testimony, the defendant's knowledge, intent, motive or method to commit the offenses charged in the present indictments, and also the relationships that exited [sic] between persons involved in this case.

You must not consider that evidence, if you
believe it, as showing that the defendant is a
person of bad character or that he has a
disposition to commit crime.

I am going to repeat that last sentence. You must
not consider that evidence, if you believe it, as
showing that the defendant is a person of bad
character or that he has a disposition to commit
crime.

(Tr. 1407-08)

In his brief, the petitioner argues that the introduction of this evidence

deprived him of his right to a fair trial, which arises under the Fourteenth

Amendment's due process clause. (#45 at 60-62)  The respondent contends that

habeas relief is unavailable on this claim because the claim involves only a

question of state evidentiary law, and not federal law.

The petitioner is correct, in that the First Circuit has acknowledged that

"a misbegotten evidentiary ruling that results in a fundamentally unfair trial

may violate due process and, thus, ground federal habeas relief." *Coningford*

*v. Rhode Island*, 640 F.3d 478, 484 (1st Cir.), *cert. denied,* 132 S. Ct. 426 (2011);

*see also, Kater v. Maloney*, 459 F.3d 56, 61 (1st Cir. 2006)("[S]tates are free to

adopt any number of different rules for criminal proceedings so long as the

application of those rules does not violate federal constitutional requirements."),

*cert. denied,* 549 U.S. 1344, 127 S.Ct. 2036 (2007).  There are, however, limitations to this principle: "To be a constitutional violation, a state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible." *Petrillo v. O'Neill*, 428 F.3d 41, 44 n. 2 (1st Cir. 2005), *cert. denied*, 547 U.S. 1117, 126 S.Ct. 1920 (2006); *see also Lyons v. Brady*, 666 F.3d 51, 56 (1st Cir. 2012)("in habeas context, relevant inquiry on appeal regarding evidentiary claim of error is 'whether any error rendered the trial so fundamentally unfair that it violated the Due Process Clause'") (quoting *Kater*, 459 F.3d at 64), *cert. denied,* 133 S.Ct. 1491 (2013).  While possible, it will be rare "that a state court's evaluative judgment- that the prejudicial effect does not substantially outweigh the probative value" was so unreasonable "as to result in a fundamentally unfair trial."  *Kater*, 459 F.3d at 64; *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001)("[N]ot every *ad hoc* mistake in applying state evidence rules, even in a murder case, should be called a violation of due process; otherwise every significant state court error in excluding evidence offered by the defendant would be a basis for undoing the conviction."), *cert. denied*, 535 U.S. 1018, 122 S.Ct. 1609 (2002).

In his brief before the MAC the petitioner argued that "[a]dmitting these

inflammatory poems caused a violation of fundamental fairness required for a criminal trial contemplated in both state and federal courts." (#39, S.A. 491) The petitioner cited to *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003), *cert. denied,* 540 U.S. 930, 124 S.Ct. 345 (2003) for support of this assertion. Such a citation satisfies the exhaustion requirement under AEDPA for the federal element of this claim. "To achieve exhaustion, 'a habeas petitioner bears a heavy burden to show that he fairly and recognizably presented to the state courts the factual and legal bases of [his] federal claim." *Coningford*, 640 F.3d at 482 (citing *Adelson*, 131 F.3d at 262). "[O]n-point citation to federal constitutional precedents" is one way in which the habeas petitioner may satisfy the fair presentment requirement. *Id.* at 482.

Despite the petitioner having presented the federal due process portion of this claim before the MAC, the MAC did not directly address the constitutional issues. The MAC described the evidence, and analyzed the claim as follows:

> *Inflammatory evidence.* The defendant claims that the admission of a) poems he wrote that suggested a sexual interest in young boys, b) his statement that the codefendant was going to "hook him up with a six year old that like to swallow," and c) other testimony that suggested

66

he was attracted to young boys, including his interest in NAMBLA (North American Man Boy Love Association) was unduly prejudicial and should have been excluded despite the failure to make timely objections at trial. There was no error. As the Commonwealth correctly argues, this evidence was relevant to the defendant's motive and intent to kidnap the victim and sexually assault him, by holding a gasoline-soaked rag to his nose and mouth if necessary. See, e.g., *Commonwealth v. Imbruglia*, 377 Mass. 682, 695 (1979); *Commonwealth v. Helfant*, 398 Mass. 214, 224 (1986) (prior bad acts are admissible to show knowledge, intent, motive, opportunity, or absence of mistake or accident).

The defendant also claims that the judge should have granted a mistrial when a witness stated that she had referred to the defendant as a pedophile. The judge responded appropriately to the errant testimony. She allowed the motion to strike and immediately instructed the jury to disregard the comment. The jury is presumed to have followed the judge's instructions. See, e.g., *Commonwealth v. Jackson*, 384 Mass. 572, 579 (1981); and see also *Commonwealth v. Horrigan*, 41 Mass.App.Ct. 337, 340 (1996), quoting from *United States v. Perez*, 22 U.S. 579, 580 (1824) (A mistrial "ought to be [declared] with the greatest caution, under urgent circumstances, and for very plain and obvious causes").

*Jaynes*, 2010 WL 2813572 at *1-2. The petitioner argues that this court should review this claim *de novo* because the state court "never decided the merits of the federal constitutional claim." (#45 at 60)

A federal court may give deference when a state appellate decision adequately addresses due process concerns by citing state court decisions that rely on federal law. "This court has recognized repeatedly that a state court may decide a federal constitutional claim 'by reference to state court decisions dealing with federal constitutional issues.'" *Hodge v. Mendonsa*, 739 F.3d 34, 41 (1st Cir. 2013) (quoting *DiBenedetto v. Hall*, 272 F.3d 1, 6 (1st Cir. 2001)); *see also Clements*, 592 F.3d at 54 ("The real question is not whether the state court opinion cited to any federal cases, but whether the opinion addresses a fairly raised federal issue."). Moreover, where the state court's holding squarely addressed the merits of overlapping state and federal claims, "it would elevate form over substance to impose some sort of requirement that busy state judges provide case citations to federal law ... before federal courts will give deference to state court reasoning. Such formalism would be contrary to the congressional intent expressed in AEDPA." *Zuluaga*, 585 F.3d at 31. Further, the Supreme Court has recently found that state court decisions are presumed to be adjudicated on the merits, even when the decision does not address the federal claim of the defendant. *Johnson*, ___ U.S. ____, 133 S.Ct. 1088, 1091 (2013) ("we hold that the federal claim at issue here . . . must be presumed to have

been adjudicated on the merits . . .").

It is unclear what impact the *Johnson* decision has on the analysis contemplated by *Zuluaga*. Where *Zuluaga* and other First Circuit cases gave no deference to state court decisions when they did not address the merits of a federal claim, *Zuluaga*, 585 F.3d at 30 ("By contrast, if the state court does not address the merits of a federal claim, we owe no such deference and our review is de novo."); *Kater*, 459 F.3d at 62 (review is de novo when state court did not address federal issue); *Fortini*, 257 F.3d at 47 (1st Cir. 2001)("we can hardly defer to the state court on an issue that the state court did not address."), post *Johnson* it is no longer certain that *de novo* review is sanctioned. *See Hodge*, 739 F.3d at 41 ("And where there is no explicit discussion of the articulated federal constitutional issue amidst the discussion of issues in the state court opinion, the federal court must presume the federal claim was adjudicated on the merits.") In this instance the matter of what level of review is of no consequence since petitioner's claim fails under both deferential and *de novo* review.

The trial court's admission of the diary entries, the evidence that Jaynes was interested in NAMBLA, the testimony that he watched a movie in which a

naked boy took a shower, or that he was, in the opinion of one witness a "pedophile" did not infuse the trial with such prejudice as to render a fair trial impossible. Evidence submitted to show motive is permissible under both Massachusetts and Federal Rules of Evidence. *Commonwealth v. Helfant*, 398 Mass. 214, 224, 496 N.E.2d 433, 441 (Mass. 1986) (evidence may be admitted if it is used "to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive."); Mass. R. Evid. 404(b) (evidence of other crimes, wrongs or acts may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge . . ."); Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, plan, knowledge, identity, absence of mistake, or lack of accident."). While a misbegotten evidentiary ruling that results in fundamental unfairness may violate due process, the rulings by the trial court judge in this case were well within the bounds of the Fourteenth Amendment.

The diary entries that were submitted into evidence were relevant to Jaynes' motive and/or intent. One entry talked of riding in Cambridge and seeing a boy of "eleven or twelve years of at most beauty" who had "a lovely tan

and crystal blue eyes,"(Tr. 726) while another described a boy's "soft curly hair, and ivory-like skin."  (Tr. 730)    At trial, the prosecution argued that these pieces of evidence help tie Jeffrey Curley to Jaynes.  Jeffrey Curley was from Cambridge, he met Jaynes in the summertime, and he had blue eyes.  (Tr. 734) Although the petitioner argues that the poems were "irrelevant or marginally relevant," and its "inflammatory potential was tremendous" (#45 at 61), it cannot be said that admission of this testimony so imbued the trial with fundamental unfairness as to violate due process.  Defense counsel was able on cross-examination and in his closing to argue that the entries were undated, that the witness wasn't with Jaynes when the poems were written, (Tr. 732) and that the evidence "didn't do a darn thing to this case as to whether he killed the boy or not, but it sure did have an effect to make you look at him in a different light and tar him with that brush." (Tr. 2226)   Contrary to the petitioner's contention, the admission of the diary entries was not so prejudicial as to undermine the petitioner's right to a fair trail.  "The Supreme Court has not established a specific constitutional rule governing character or 'bad acts' evidence and, therefore, 'the broader fair trial principle is the beacon by which we must steer.'" *Crouse v. Dickhaut*, 2013 WL 1054845 at *11 (D. Mass.

2013)(quoting *Coningford*, 640 F.3d at 485).

Likewise, the testimony of Sarah Wetterhahn in which she said that Jaynes told her that Robert Sicari "was going to hook him up with a six-year-old that liked to swallow" (Tr. 978) did not imbue the trial with fundamental unfairness. As was argued during the trial, the statement about the six year old was entered into evidence to rebut the defense's story that Jaynes would never act out on his fantasies. (Tr. 975) As the prosecution argued, these statements "indicate[ ] that Mr. Jayne's intent on October 1st of 1997 was not merely to pickup Jeffrey Curley and let him be in the company of Salvatore Sicari, as Mr. Jubinville said in his opening, but to pick up Jeffrey Curley and to try to have sex with him." *Id.*  Intent and motive are permissible reasons for the introduction of prior bad acts under both the Massachusetts and Federal Rules of Evidence.  The trial court was within the bounds of the Fourteenth Amendment to say that the testimony of Sarah Wetterhahn helped to demonstrate intent.

Similarly, the petitioner's contention that the testimony of William Pellegrini should have been excluded is without merit.  Pellegrini testified that Jaynes told him that "there was a boy that he was interested in who a friend of

his brother's was going to hook him up with." (Tr. 950) Pellegrini also testified that Jaynes described the boy as having "chubby cheeks, red hair, and crooked teeth," that he was going to "fuck around with him," and that if the boy didn't "that Sal would take care of him." *(Id.* at 951-52) Clearly this portion of Pellegrini's testimony is highly relevant to the underlying facts of the case. Not only did Jayne's describe Jeffrey Curley to Pellegrini, but he also described his intentions. There is simply no argument that this testimony should not have been allowed. Similarly, the scant testimony that Pellegrini offered with respect to Jaynes' "strong interest" in NAMBLA (Tr. 945) and the testimony about watching a foreign film that contained a naked young boy *(Id.)* does not rise to the level of a due process violation. In *Dowling v. U.S.*, 493 U.S. 342, 352 (1990) the Supreme Court noted that the category of infractions that violate "fundamental fairness" is very narrow. Pellegrini's testimony regarding NAMBLA and the foreign film was limited to a very brief exchange. Given the brevity of the testimony, and the fact that the testimony was probative of Jaynes' possible intentions with regard to Jeffrey Curley, it can not be said that the introduction of this testimony violated the Fourteenth Amendment.

Further supporting this finding is the fact that the trial judge gave a final

limiting instruction during the jury instructions on the prior bad acts.

> Now, in regard to prior evidence, evidence of prior bad acts, if you determine that there was such evidence, this defendant is not on trial for any act or conduct other than what occurred on October 1st, 1997, in regard to the murder and kidnapping of Jeffrey Curley; however, you may consider his earlier statements or acts, if you believe them, for only a limited purpose, that is, for the purpose of the defendant's knowledge, intent, motive or method to commit the offenses alleged in the present indictments.

(Tr. 2326-27)

It is a "basic premise" of the jury system to assume that a jury follows a court's instruction. *Morales-Vallellanes v. Potter*, 605 F.3d 27, 34-35 (1st Cir. 2010) ("'A basic premise of our jury system is that the jury follows the court's instructions,' and therefore we assume, as we must, that the jury acted according to its charge.")(quoting *Refuse v. Environmental Systems Inc. v. Industrial Services of America, Inc.*, 932 F.2d 37, 40(1st Cir. 1991), *cert. denied,* 131 S.Ct. 978 (2011); *United States v. Rodriquez*, 735 F.3d 1, 12 (1st Cir. 2013)("we customarily assume that jurors follow the instructions given to them by the district court."), *cert. denied,* 2014 WL 1124875 (2014). Given the court's instruction and the probative value of the evidence, the admission of this

evidence does not rise to the level of a due process violation.

Likewise, the comment that Jaynes was a "pedophile" does not violate the due process clause. Charlene Letourneau's stray comment that "I told him he was a pedophile . . ." (Tr. 1378) was instantly followed by an instruction to the jury to disregard the comment.

> The last statement of the witness is stricken, and the jury will disregard it. The statement of the witness that she learned something, that she learned that Mr. Jaynes was a pedophile at about that time is stricken. You will not consider that statement in any way in your deliberations in this case. It is as if that statement were never said.

(Tr. 1379)

When a jury has been exposed to improper evidence, the trial court must strike that evidence and provide a curative instruction. *United States v. Pagan-Ferrer*, 736 F.3d 573, 586 (1st Cir. 2013). It is only when evidence is so "seriously prejudicial" that a curative instruction wont be a sufficient antidote. *Id.* citing *United States v. Sepulveda*, 15 F.3d 1161, 1184 (1st Cir. 1993) ("Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable . . ."). The stay comment by Letourneau was instantly cured by the court, and did not rise to the level of being so "seriously prejudicial" as to

warrant a mistrial.  Petitioner's claim that Letourneau's comment denied him the right to a fair trial is therefore without merit.

## GROUND SIX:

### Evidence of Jaynes' failure to speak to the police

Petitioner argues that his Fifth Amendment right against self-incrimination was violated when the judge failed to instruct the jury as to the fact that Jaynes had no obligation to speak to the police.  At trial the prosecution elicited testimony that the police sought to speak to Jaynes, but Jaynes told them he could not because he was working, and he later failed to contact them.  Petitioner argues that the jury should have been instructed that Jaynes had no obligation to speak to the police, and that his failure could not be considered evidence of his guilt. (#45 at 62)

The MAC held that this evidence was properly admitted and that no instruction was necessary.

> The defendant told two witnesses that the police wanted to talk to him but that he had not yet had time meet [*sic*] with them. In addition, he told a police officer that he would call the next day, but never did.  The defendant claims that the judge should have instructed the jury, sua sponte, that he had no obligation to talk to the police.  We have never required a judge to give such an instruction, nor do we do so here.

> Contrary to the defendant's contention, the
> evidence was properly admitted as probative of
> the defendant's consciousness of guilt and did
> not implicate the defendant's guarantee against
> compelled testimony set forth in the Fifth
> Amendment of the Constitution. See
> *Commonwealth v. Reveron*, 75 Mass.App.Ct. 354,
> 359 (2009), citing *O'Laughlin v. O'Brien,* 568
> F.3d 287, 303 (1st Cir. 2009) (defendant's
> reluctance to come to the police station and
> agitation during an interview could indicate
> consciousness of guilt for some crime); and see,
> e.g., *Rock v. Arkansas*, 483 U.S. 44, 52-53
> (1987).

*Jaynes*, 2010 WL 2813572 at *2.

Once again the petitioner asks this court to review the state court's decision *de novo*, arguing that the MAC's citation "make[s] it apparent that it did not actually address the particular federal constitutional issue which the petitioner presented." (#45 at 65) *De novo* review is not warranted however, because as discussed earlier, the Supreme Court has recently confirmed that even a summary disposition is considered an adjudication "on the merits" for purposes of AEDPA. *Johnson,* 133 S.Ct. at 1091. Here, the MAC decision specifically addressed the petitioner's Fifth Amendment concerns. There is, therefore, no argument that the MAC failed to address the petitioner's claim "on the merits."

Defendant's broader argument that the petitioner was under no obligation to talk with the police is misguided. While the Fifth Amendment privilege against self-incrimination protects a defendant from disclosing his own illicit activities, it does not provide blanket protection against requiring citizens from talking to the police. "Unless his silence is protected by the privilege against self-incrimination . . ., the criminal defendant no less than any other citizen is obliged to assist the authorities." *United States v. Caraballo-Rodriquez*, 480 F.3d 62, 72 (1st Cir. 2007) (quoting *Roberts v. United States*, 445 U.S. 552, 558, 100 S.Ct. 1358, 1363), *cert. denied*, 552 U.S. 993 (2007) (alteration original). In fact, in the *Caraballo-Rodriquez* case the defendant was being prosecuted under the federal misprision statute. "It is well settled that the government need not make the exercise of the Fifth Amendment privilege cost free." *McKune v. Lile*, 536 U.S. 24, 41 (2002).

Furthermore, the Fifth Amendment privilege against self-incrimination is not self-executing. A person wishing to invoke it may not simply remain silent, but rather must claim it. "Our cases establish that a defendant normally does not invoke the privilege by remaining silent." *Salinas v. Texas,* ___ U.S. ____, 133 S.Ct. 2174, 2178 (2013) (plurality opinion). "Despite its cherished

position, the Fifth Amendment addresses only a relatively narrow scope of inquiries. Unless the government seeks testimony that will subject its giver to criminal liability, the constitutional right to remain silent absent immunity does not arise." *Garner v. United States*, 424 U.S. 648, 655, 96 S.Ct. 1178, 1183 (1976). Recently the Supreme Court affirmed the use of a defendant's silence. In *Roberts,* the defendant's silence during a non-custodial police interrogation was used to enhance his sentence. The Supreme Court found that such a use of a defendant's silence did not violate the Fifth Amendment. *Roberts*, 445 U.S. at 558; *see also*, *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014) ("[T]he Supreme Court held that prosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt if the defendant did not expressly invoke his right to remain silent."). The record in this case contains no evidence that the petitioner invoked his right to remain silent, which means that the prosecutor's comments regarding his pre-arrest statements are admissible.[17] The defendant did not assert his right against self-incrimination, nor could his silence be

---

[17]    While the *Roberts* decision was not decided until after the MAC decision, its holding still applies. The Supreme Court has specifically stated "that courts assessing whether a defendant was prejudiced by his counsel's errors may not consider the effect of such now-void objections." *Abby*, 742 F.3d at 228; *see also Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor concurring) ("[T]oday we hold that the court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law, even if the objection might have been considered meritorious at the time of its omission.").

perceived as an assertion of the right, and therefore the testimony regarding his silence was admissible.

Even without the *Roberts* pronouncement, the MAC decision should be upheld.  At the time of the MAC decision, there was a split among the circuits as to whether a defendant's pre-arrest silence could be used as evidence of guilt. "The courts of appeal are split as to 'whether, under some circumstances the Fifth Amendment privilege against self-incrimination prevents the government from using a suspect's pre-arrest silence as substantive evidence of guilt." *United States v. Rodriquez*, 667 F. Supp.2d 223, 227 (D. Mass. 2009) (quoting *United States v. McCann*, 366 F.3d 46, 56-57 (1st Cir. 2004)((identifying the circuit split but resolving case on other grounds), *vacated and remanded on other grounds,* 543 U.S. 1104, 125 S.Ct. 986 (2005)).  When reviewing a state court decision under AEDPA, that decision may only be overturned when it unreasonably applied clearly established federal law. If Supreme Court cases "give no clear answer to the question presented," a state court's resolution of a constitutional question may not serve as a basis for habeas relief.  *Wright v. Van Patten*, 552 U.S. 120, 126, 128 S.Ct. 743, 747 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77, 127 S.Ct. 649, 654 (2006)(a lack of holdings from the Supreme

Court regarding a topic bars a finding that a state court "unreasonably appli[ed] clearly established Federal Law."). Thus, it could not be an unreasonable application of federal law for the MAC to have found that there was no error on the part of the trial court to admit the statement that the defendant did not talk to the police.

## GROUND SEVEN:

### Evidence relating to Sicari's statements

Petitioner argues that the trial court's ruling denying the introduction of some of Sicari's statements violated Jaynes' Fifth, Sixth and Fourteenth Amendment rights to due process, his right to present a defense, and his right to confront and cross-examine an adverse witness. Specifically Jaynes sought to introduce Sicari's statement "I'm guilty, lock me up," (#53, Ex. 2 at 2-56) as well as the statements Jaynes himself made to the police in which he said "I want to tell you something about [Sicari]" and "I could held you guys find Jeffrey Curly." (#45 at 66) The trial court ruled that Sicari's statement could only be introduced if the prosecution was permitted to introduce the other part of Sicari's statement "I'm guilty, but I didn't kill Jeffrey Curley, Charles Jaynes did." (#53 Ex. 3 at 3-38) As the MAC found "The defendant has no right to manipulate the evidence such that it appears to be more exculpatory than it is."

81

*Jaynes*, 2010 WL 2813572 at *2. The judge also ruled that the petitioner could not introduce statements of his own in which he offered to help find the victim, without also allowing the prosecution to put forth testimony that no such help was ever provided. (Tr. 600, 1732)

In it's ruling, the MAC found that there was no error for the judge to have ruled on the admissibility of the statements and that "even if we were to assume that the defendant is correct, any error did not create a substantial risk of a miscarriage of justice given that a reasonable inference would be that the defendant's knowledge of the incident came from his participation in the crime." *Jaynes*, 2010 WL 2813572 at *2.

Neither of petitioner's claims were raised in petitioner's First Appeal. These claims were raised for the first time in the Second Motion for a New Trial. Massachusetts Rule of Criminal Procedure 30(c)(2) states that post conviction motions for a new trial based on grounds available but not raised on direct appeal are waived. A finding of waiver changes the standard of review applied. *Commonwealth v. Edward*, 75 Mass. App.Ct 162, 165; 912, N.E.2d 515,518 (Mass. App. Ct. 2009). Unpreserved claims of error and claims of ineffective assistance of counsel based on failure to preserve claims of error are reviewed

by the state court under the "substantial miscarriage of justice" standard. *Id.; Commonwealth v. Azar,*435 Mass. 675, 685, 760 N.E.2d 1224, 1232 (2002). The rules regarding waiver and its consequences apply equally to constitutional and nonconstitutional claims. *Edward*, 75 Mass. App.Ct at 165; 912, N.E.2d at 518; *Commonwealth v. Watson*, 409 Mass. 110, 112; 565 N.E.2d 408, 409 (Mass. 1991)("The rule of waiver applies equally to constitutional claims which could have been raised, but were not raised on direct appeal or in a prior motion for a new trial.") (internal quotation and citations omitted). The fact that a state court reviews for a "substantial likelihood of a miscarriage of justice" does not constitute a waiver of the requirement that the defendant raise the issue on his direct appeal. *Obershaw v. Lanham*, 453 F.3d 56, 68 (1st Cir. 2006), *cert. denied,* 549 U.S. 1125, 127 S.Ct. 957 (2007).

Here, the Commonwealth argues that the petitioner has procedurally defaulted on his claim. This Court agrees that the claim is procedurally defaulted. *See, e.g., Janosky*, 594 F.3d at 44 ("Federal habeas review of a particular claim is precluded in circumstances in which a state prisoner has defaulted on that claim in state court by virtue of an independent and adequate state procedural rule.")(citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Although the MAC conducted a merits analysis of Jaynes's claims under the miscarriage of justice standard, "[t]his discretionary miscarriage-of-justice review does not amount to a waiver of the state's contemporaneous objection rule." *Id*. Given the procedural default, this court can only address the claim "where 'the prisoner can demonstrate cause for the default and actual prejudice . . .'" *Obershaw*, 453 F.3d at 68 (quoting *Coleman*, 301 U.S. at 750).

Jaynes, anticipating this defense, contends that even if there was procedural default it was caused by the constitutional ineffectiveness of counsel. (#45 at 68) Such an argument in unavailing. The Supreme Court has found that the right to present evidence or elicit testimony is not without limits. "A defendant's right to present relevant evidence in not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264 (1998). Where, as here, the defendant seeks to only introduce partial statements the truthfulness of which are truncated in self-serving fashion, the court may impose a rule limiting those statements. "[R]estrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule

justify the limitation imposed on the defendant's constitutional right to testify." *Rock v. Arkansas*, 483 U.S. 44, 55-56, 107 S.Ct. 2704, 2711 (1987). "As we have noted elsewhere, 'the Supreme Court has rarely overturned state convictions because evidence was excluded and has in recent years made clear that only in extreme cases' will such claims succeed." *Brown v. Ruane*, 630 F.3d 62, 74 (2011) (quoting *Commonwealth v. O'Brien*, 453 F.3d 13, 20 (1st Cir. 2006) (alterations original). The Constitution guarantees a defendant a right to present a complete defense, but it does not do so at the exclusion of inculpating evidence. Here, the trial court did not attempt to bar the testimony altogether; instead, the information could come into evidence but only if it were complete. Given that the court's underlying finding- that the statements were admissible only if their full context was introduced- was constitutional, trial counsel can not be found ineffective for failing to challenge the court's ruling. Counsel is not ineffective for failing to bring a futile argument. Since there was no Constitutional violation from the judge's ruling, it was not ineffective for trial counsel to omit this argument from the petitioner's first appeal.

## IV. RECOMMENDATION

For all the above reasons, I RECOMMEND that (1) the petitioner's motions under 28 U.S.C. §2254 to Vacate, Set Aside, or Correct Sentence by a Person in State Custody (#34) be DENIED, and (2) Final Judgment enter DISMISSING the action.

## V. REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that any party who objects to this recommendations must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Robert B. Collings

ROBERT B. COLLINGS
January 13, 2015.     United States Magistrate Judge